**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN SCHNIPPER, an individual and SUNFLOWER ENTERPRISES, L.P., a New Jersey limited partnership, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 12-CV-7367 |
| CNC DEVELOPMENT LTD. (f/k/a InterAmerican Acquisition Group Inc., a Delaware Corporation), a British Virgin Islands corporation, and WILLIAM C. MORRO, an individual, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

**COMPLAINT FOR
INJUNCTIVE RELIEF AND DAMAGES**

As and for its Complaint for Injunctive Relief and Damages (the "Complaint") against Defendants CNC Development Ltd. (f/k/a InterAmerican Acquisition Group Inc.) ("CNC"), and William C. Morro ("Morro") (collectively, the "Defendants") Plaintiffs Steven Schnipper ("Schnipper") and Sunflower Enterprises, L.P. ("Sunflower") (collectively, the "Plaintiffs") state and allege as follows:

**NATURE OF THE ACTION**

1.     This is an action for, among other things, federal securities fraud, common law fraud, breach of fiduciary duties, declaratory relief, and injunctive relief. The Plaintiffs' claims arise out of, among other things, Defendants' unjustified refusal to pay a special dividend that was declared in connection with a merger transaction, and for which funds have been set aside as reflected on CNC's publicly filed financial reports. Until May 30, 2012, the Defendants have claimed to be investigating whether the declared dividends were, in fact, payable to the

Plaintiffs. On that date, Morro informed the Plaintiffs that CNC will not pay the dividends due and owing to the Plaintiffs, despite the fact that the Defendants have been unable to show that the shares in question do not qualify for the dividend.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act") (15 U.S.C. § 78j(b) and § 78t(a), respectively) and Rule 10b-5 promulgated thereunder (17 C.F.R § 240.10b-5), and arise under and pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201(a)).

2.      This Court has original jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction to hear and determine the Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1391(b) and (c).  Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

4.      WHI, Inc. ("WHI"), CNC's U.S. agent, is a citizen of Illinois and thus, CNC is subject to personal jurisdiction in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

## PARTIES

6.      Plaintiff Steven Schnipper is an individual and a citizen of New Jersey.  At all

2

times relevant to this Complaint, Schnipper owned 10,000 shares of InterAmerican Acquisition Group Inc. ("IAG") stock. In connection with the merger transaction at issue herein, Schnipper's shares were converted to 1,850 shares of CNC common stock and 8,857 shares of CNC Class A Preferred shares stock, all of which he still possesses.

7.      Plaintiff Sunflower Enterprises, L.P. is a limited partnership that is a citizen of New Jersey. At all times relevant to this Complaint, Sunflower owned 3,000 shares of CNC stock. In connection with the merger transaction at issue herein, Sunflower's shares were converted to 555 shares of CNC common stock and 2,685 shares of CNC Class A Preferred shares stock, all of which it still possesses.

8.      Defendant CNC Development Ltd. is a British Virgin Islands corporation. CNC was formerly known as IAG, which was a Delaware corporation with its principal executive offices in San Diego, California. At all times relevant to this case, Defendant Morro was the Chief Executive Officer ("CEO") of IAG and signed all relevant documents that were filed with the Securities and Exchange Commission ("SEC") in relation to the merger transaction at issue. At all times relevant to this case, CNC maintained an agent in Chicago, Illinois known as WHI. WHI is a Wyoming corporation with a president and agent for service of process who lives in Chicago, Illinois. That president and agent is Defendant Morro.

9.      CNC's most recent filing with the SEC, a Notification of Late Filing (Form 12B-25, attached hereto as Exhibit 1) with respect to its annual report for the fiscal year ended December 31, 2011, represents that its principal executive office is located at 410 South Michigan Avenue, Suite 620, Chicago, Illinois 60605. This is the same address that WHI currently possesses. CNC's most recent filing also provides Defendant Morro as the contact person and provides a Chicago, Illinois telephone number.

3

10.     Defendant William C. Morro is a resident and citizen of Chicago, Illinois.  At all times relevant to this matter, he was a director and officer of IAG, acting as IAG's CEO, Chief Financial Officer ("CFO) and Chairman of the Board of Directors, the CEO of CNC, and the President of WHI, CNC's U.S. agent.  Morro signed all relevant public filings at issue in this matter and was intimately involved in making all disclosures and statements made in public documents filed with the SEC.

11.     Morro has extensive knowledge and expertise in the fields of securities and investments.  He has been involved in securities and investments since at least 1986, when he co-founded and was a principal in a private investment firm.  From 1994 to 1996, he served as the President of Heller Investments, Inc., a subsidiary of Heller Financial, Inc.

12.     In 1996, Morro founded the US. Merchant Bank for the Bank of Montreal Group and served as that entity's President until 2001.

13.     From 2001 to 2010, Morro was a partner at InterAmerican Group, which was an advisory and investment firm focused on cross-border transactions, including the merger transaction at issue herein.

14.     Morro currently leads the Restructuring and Special Situations practice at Chardan Capital Markets and continues to serve on the Board of Directors at CNC.

## GENERAL ALLEGATIONS

15.     Morro and another individual formed IAG for the purpose of entering into an acquisition with another company, *i.e.*, as a blank check company.

16.     In a prospectus filed with the SEC on August 10, 2009, IAG provided details regarding a merger transaction with Sing Kung, a Chinese company.  The resulting entity would be being known as CNC Development, Ltd., while Sing Kung and IAG would no longer exist.  Relevant portions of the prospectus are attached hereto as Exhibit 2.  The entire document can be found at

4

http://www.sec.gov/Archives/edgar/data/1328494/000114420409041581/v156492_424b4.htm.

17.     The prospectus also stated that IAG expected to pay a $4.85 per share special dividend on its shares in connection with the closing of the merger transaction (the "Closing Dividend").

18.     On or around August 31, 2009, a notification was published on the OTC Bulletin Board Daily List that the $4.85 per share Closing Dividend would be paid to all qualifying stockholders of record as of September 4, 2009, with a dividend payment date of September 14, 2009.  CNC later informed investors through a press release that all conditions for payment of the Closing Dividend had been met as of September 9, 2009.  (*See* Sept. 11, 2009 press release, attached as Exhibit 3.)

19.     However, IAG's notification to the Financial Regulatory Authority, Inc. ("FINRA") of the Closing Dividend came less than ten (10) days prior to the record date of September 4, 2009 set by IAG, which directly violates Rule 10b-17(b) of the Exchange Act (17 C.F.R. § 240.10b-17(b)).  Pursuant to Rule 10b-17(a), a violation of subsection (b) is, by definition, "a manipulative or deceptive device or contrivance," which, in turn, is a violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

20.     After the closing of the merger transaction, as published on the OTC Bulletin Board Daily List on September 10, 2009, FINRA set an ex-dividend date of September 15, 2009 with respect to trading in IAG securities.  (*See* OTC Bulletin Board printout, attached as Exhibit 4.)  As relevant to the allegations herein, the day prior to the ex-dividend date was the last date on which an investor could purchase IAG shares and still be entitled to receive the $4.85 per share Closing Dividend on the shares purchased, regardless of the record date set by CNC.  On or after the ex-dividend date, a security is traded without a specific dividend or distribution.

21.     According to IAG's filings with the SEC, after the closing of the merger transaction, CNC was responsible for paying the Closing Dividend declared by IAG.

22.     On September 9, 2009, IAG filed a Form 8-K with the SEC, which disclosed that IAG had consummated its business combination with Sing Kung pursuant to an Amended and Restated Stock Purchase Agreement, through which IAG purchased substantially all of the outstanding shares of common stock of Sing Kung. (*See* Exhibit 5.)

23.     On September 9, 2009, Schnipper purchased 3,000 shares of IAG stock. Sunflower also purchased 3,000 shares of IAG stock on that date. (*See* Group Exhibit 6.)

24.     On September 10, 2009, Schnipper purchased another 11,000 shares of IAG stock. Sunflower purchased an additional 3,000 shares of IAG stock on that date. (*Id.*)

25.     On September 11, 2009, Schnipper sold 2,500 shares of IAG stock. Sunflower sold 3,000 shares of IAG stock on that date, which was its last transaction in IAG's stock, leaving it with 3,000 shares of IAG stock as of that date. (*Id.*)

26.     On September 14, 2009, Schnipper sold 1,500 shares of IAG stock, which was his last transaction in IAG stock, leaving him with 10,000 shares of IAG stock. (*Id.*)

27.     Because all of the purchases of by Schnipper and Sunflower were made prior to the ex-dividend date, all shares that they hold should be entitled to receive the Closing Dividend from CNC.

28.     However, upon information and belief, CNC did not agree with the ex-dividend date set by FINRA and therefore, decided to send dividend payments directly to its own list of beneficial owners. This left unpaid those investors who purchased after the record date, but before the ex-dividend date, with the legitimate expectation of receiving the Closing Dividend.

29.     Further, in order to secure the votes necessary to approve the contemplated merger transaction, IAG, acting through its agent Morro, negotiated and entered into stock repurchase agreements with certain dissenting shareholders. In an SEC filing on September 1, 2009, IAG, through a filing signed by Morro, disclosed that it had reached stock repurchase agreements to repurchase more than 3 million IAG shares from dissenting shareholders who otherwise would not

have approved the merger transaction. (*See* Exhibit 7.)

30. According to that September 1, 2009 filing, the compensation to be paid to these dissenting shareholders was to be "paid for with funds that are presently in IAG's trust account and will become CNC''s funds as a result of the business combination." That filing also referred to a section of the proxy statement/prospectus relating to the merger transaction entitled "*Summary of the Proxy Statement/Prospectus – Actions that May Be Taken to Secure Approval of IAG's Stockholders.*" In addition, the September 1, 2009 filing attached a "Representative Form of Stock Purchase Agreement" relating to the repurchase of stock from dissenting shareholders. (*Id.*)

31. Neither the referenced section of the proxy statement/prospectus (Ex. 2, p. 30 (using prospectus page numbers)) nor the form stock purchase agreement disclosed that, as part of the compensation paid to the dissenting shareholders, the dissenting shareholders would receive or be allowed to retain IAG shares and waive the dividends on those shares.

32. It was never disclosed at that time or at any point prior to the purchases of IAG shares by Schnipper and Sunflower that, as part of the compensation paid to the dissenting shareholders, the dissenting shareholders would receive or be allowed to retain IAG shares and would waive the dividends on those shares.

33. It also was never disclosed that such shares with a waived dividend would be unrestricted such that they could be sold into the market and purchased by unwitting investors.

34. Indeed, nothing in the stock repurchase agreements negotiated by Morro, IAG, and CNC, restricted the dissenting shareholders from trading in the IAG stock with the waived dividend. Further, it was never timely disclosed to investors that such shares were capable of being sold into the market. Upon information and belief, the dissenting shareholders sold some of the shares with the waived dividends into the market.

35. IAG and CNC, through Morro, recklessly failed to take any precautions against or require or enforce any restrictions against the dissenting shareholders reselling the non-dividend

shares into the market without disclosing the waiver with respect to such shares. Consequently, once these shares were sold into the market, investors, including the Plaintiffs here, had no way of knowing whether the shares were entitled to a dividend.

36.     In a press release on September 11, 2009 (Ex. 3), CNC announced for the first time that it "has been informed that approximately 100,000 shares of IAG's common stock sold by sellers who waived their rights to receive the [Closing] [D]ividend have been sold into the public market."

37.     Then, in a belated filing made by CNC with the SEC on September 15, 2009 and signed by Morro, it was disclosed for the first time that, with respect to the repurchase agreements entered into with dissenting shareholders, "the aggregate purchase price was $35,368,413 in cash *and 180,982 shares of IAG common stock (on which the closing dividend has been waived).*   (See 9/15/09 Form 8-K filed by CNC, p. 3 (emphasis added), attached hereto as Exhibit 8.)

38.     Prior to the September 15, 2009 Form 8-K filing with the SEC, it had never been disclosed by IAG, CNC, or Morro either (1) that the purchase price paid to the dissenting shareholders included not only cash, but also IAG common stock or (2) that the dissenting shareholders had waived their right to the Closing Dividend with respect to the IAG common stock they received as compensation in connection with the repurchase agreements.

39.     On September 17, 2009, a partial dividend payment was made to Schnipper's E*Trade trading account in the amount of $55,775.00, but CNC immediately caused that transaction to be reversed on September 18, 2009, taking money out of Schnipper's account. (See Group Exhibit 9.)

40.     On September 17, 2009, a partial dividend payment was made to Sunflower's E*Trade trading account in the amount of $14,550.00, but CNC immediately caused that transaction to be reversed on September 18, 2009, taking money out of Sunflower's account.  (*Id.*)

41.     Since that time, Schnipper, on behalf of both himself and Sunflower, has contacted Morro numerous times *via* e-mail and phone to try to determine if CNC is going to pay Schnipper

and Sunflower the dividends owed to them.

42.    Morro claimed to Schnipper in phone calls and emails that CNC was unable to determine who the counterparties were to the purchases by Schnipper and Sunflower and that CNC was continuing to try to determine whether the shares owned by Schnipper and Sunflower were eligible for payment of the Closing Dividend.  Morro and CNC also continued to claim in its public filings that CNC was investigating the eligibility of certain shares for payment of the Closing Dividend.

43.    For example, as of December 15, 2009, Morro represented that he was attempting to negotiate a repurchase of the shares bought by Schnipper and Sunflower, claiming to have obtained an agreement by two of the large sellers of stock on which the dividend was waived to agree to repurchase the shares Schnipper and Sunflower purchased.  (*See* Group Exhibit 10.)  That repurchase never occurred.

44.    As of August 15, 2011, CNC, through Morro, was still representing in its Form 20-F Annual Report filed for the fiscal year ended December 31, 2010 that "$68,480 . . . of the [Closing] [D]ividends payable remained unpaid since uncertainties exist about payee eligibility."  (*See* Form 20-F, p. F-30, filed Aug. 15, 2011, relevant portions of which are attached as Exhibit 11, *available at* http://www.sec.gov/Archives/edgar/data/1442508/000114420411046297/v229024_20f.htm.)    CNC further stated that it "is uncertain when or if it will be able to resolve outstanding dividend claims and to pay out the full amount of the remaining dividends payable, however, the dividends payable are shown as current reflecting the Company's intent to resolve outstanding claims and make payment in full within the current calendar year."  (*Id.*, p. F-30.)  CNC also maintained a dividend payable amount on its balance sheet of $68,480.  (*Id.*, p. F-2)

45.    CNC has failed and refused to pay Schnipper and Sunflower the dividend owed to them.

46.    On April 27, 2012, counsel for Schnipper and Sunflower contacted CNC, through a

9

letter sent to Morro at WHI, to demand payment of the unpaid dividends. (*See* Exhibit 12.)

47.     In a letter dated May 30, 2012, CNC, through its Chicago-based U.S. agent, WHI, and WHI's President and CNC's CEO, Morro, responded to the April 27, 2012 demand letter. (*See* Exhibit 13.) In his letter, Morro refused the demand for payment, stating that Schnipper and Sunflower "have not established that they met the eligibility criteria for the $4.[8]5 per share special dividend established by the IAG Board" and that "the Company has no intention of allowing an undeserved payment to be made to [Schnipper and Sunflower] at the expense of other CNC shareholders."

48.     Morro admitted in that letter that he and various individuals engaged by CNC to evaluate the Closing Dividend claims and distribution "had numerous conversations and e-mail exchanges with Schnipper and the broker . . . during the last calendar quarter of 2009, and in 2010 and 2011." (*See id.*; *see*, *e.g.*, Group Ex. 10)

49.     The May 30, 2012 letter was the first time Morro stated that CNC was not continuing to investigate the eligibility, but rather was simply not going to pay the dividend.

50.     In the May 30, 2012 letter, instead of taking responsibility for his failure to cause either IAG or CNC provide full and fair disclosure of material information to investors, Morro blamed Schnipper and Sunflower for the non-payment of the dividend by making the incredible statement that they somehow should have known about the undisclosed dividend waiver based upon the price of the shares they purchased. Morro also stated that "the Company bears no responsibility in such cases and it had no duty to lock up or restrict the sophisticated counterparties with whom it entered into IAG Dividend Waivers."

51.     The May 30, 2012 letter admits that Morro and CNC still do not know whether the shares purchased by Schnipper and Sunflower were shares with respect to which the dividend had been waived.

52.     However, as stated above, of the amount initially set aside by CNC to pay the Closing

Dividends, as of December 31, 2010, CNC maintained a dividend payable amount on its balance sheet of only $68,480 due to alleged uncertainties about payee eligibility, an amount which is nearly equal to the dividends that should have been paid to Schnipper and Sunflower. Further, in his May 30, 2012 letter, Morro stated that Schnipper and Sunflower are the only potential payees who have any outstanding issues with CNC with respect to payment of the dividends.

53.     As such, there is an amount set aside on CNC's balance sheet that has already been determined to be due and owing with respect to IAG shares, which, in turn, already have been determined to be eligible for payment of the dividend. That amount is nearly equal to the amount of dividends claimed by Schnipper and Sunflower herein and, according to Morro, no other person or entity is claiming it. Despite this fact, Morro and CNC are refusing to pay the Closing Dividend to Schnipper and Sunflower, purportedly to protect other CNC shareholders (of which Morro is a significant one).

54.     Finally, contrary to the representations in Morro's letter, and as set forth more fully herein, IAG, CNC, and Morro made neither full nor timely disclosure of the transactions involving waivers of dividends.

55.     Indeed, many of the actions Morro represented were taken by CNC and/or IAG came only after the purchases by Schnipper and Sunflower.

56.     As a result of the merger transaction, Morro benefitted greatly and became the CEO of CNC. Morro also was one of IAG's initial stockholders and IAG's largest shareholder. He directly owned more than 500,000 shares of IAG common stock and indirectly owned as a beneficial owner more than 715,000 shares of IAG common stock as of August 10, 2009. (Ex. 2, pp. 226, 230.) Following the merger, Morro was the beneficial owner of more than 765,000 CNC shares. (Ex. 8, p. 6.) Prior to the merger, Morro's IAG shares were valued in excess of $5 million. Had the merger not occurred, Morro's shares would have been worthless.

57.     Morro further benefitted from the merger by being released from certain

indemnification obligations relating to approximately $700,000 in accrued and unpaid liabilities that IAG had incurred as of June 30, 2008, not including franchise tax liabilities of approximately $222,000. (Ex. 2, p. 33.) Morro had agreed to be personally liable for 60% of the accrued and unpaid liabilities. (*Id.*) As such, had the merger not occurred, he would have been personally liable for these obligations.

58.     In the September 15, 2009 filing in which CNC revealed for the first time that its stock repurchase agreements enabled certain shareholders to be paid IAG stock in exchange for waiving the dividend on that stock, Morro listed his Chicago telephone number as the telephone number for CNC Development Ltd. (See Ex. 8, p. 1.)

59.     All communications relevant hereto that were made in SEC filings by IAG and CNC were made from Chicago by and through Morro, who signed all such filings.

60.     All communications with Schnipper following CNC's formation were made through Morro or CNC's Chicago-based U.S. agent, WHI, which in turn communicated through its President, Morro.

**COUNT I**
**FEDERAL SECURITIES FRAUD**
**Violation of Section10(b) of the Securities Exchange Act and Rule 10b-5**
**(against all Defendants)**

61.     The Plaintiffs restate and reallege Paragraphs 1 through 60 as though fully set forth herein.

62.     As set forth above, IAG, Morro, and CNC, made false and misleading statements of material fact to the Plaintiffs regarding the stock repurchase by omitting material information relating to type of consideration that would be paid to the dissenting shareholders in exchange for their vote to approve the merger between IAG and Sing Kung and by omitting material information regarding the fact that these non-dividend shares were not restricted from being sold into the public market. IAG, Morro, and CNC had a duty to disclose this material information in

order to make the publicly filed statements at issue here not misleading, including without limitation, the August 10, 2009 Prospectus/Proxy (Ex. 2), the September 1, 2009 IAG Form 8-K (Ex. 7), and the September 9, 2009 IAG Form 8-K (Ex. 5).

63.     IAG, CNC, and Morro omitted these material facts from public filings with the SEC to induce the Plaintiffs and other potential shareholders to rely on them in deciding whether to purchase IAG shares and to induce the dissenting shareholders to accept the stock repurchase agreements, despite the fact that IAG, CNC, and Morro knew that at least some of IAG's shares were ineligible to receive a dividend as a result of the stock repurchase transactions.  The Defendants omitted these material facts to ensure that the merger between IAG and Sing Kung was approved, thus ensuring that they would obtain the significant financial benefit they would gain as a result of the merger occurring.

64.     IAG, Morro, and CNC acted with scienter because they knew that these public documents they filed with the SEC and the statements they made or caused to be made were materially false and misleading, knew that such documents and statements would be disseminated to the investing public, and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

65.     IAG and Morro, and after the merger, CNC and Morro, knew at the time they made the false and misleading public disclosures that they were omitting to fully and accurately disclose the true nature of the stock repurchase transactions and the compensation that was to be paid to the dissenting shareholders, including the waiver of dividends.

66.     In fact, although the agreements to enter into the stock repurchases reportedly were largely entered into prior to September 1, 2009, it was not until September 15, 2009, the

same date as the ex-dividend date, that CNC disclosed the true nature of the stock repurchase transaction, including the fact that the purchase price paid to the dissenting shareholders was comprised not only of cash, but also of 180,982 shares of IAG common stock on which the closing dividend had been waived.  (Ex. 8.)  Indeed, the September 1, 2009 public disclosure of these transactions stated only that they "will be effected by [CNC] after the closing of the stock purchase described in the proxy statement/prospectus and would be paid for with funds that are presently in IAG's trust account and will become CNC's funds as a result of the business combination."  (Ex. 7.)

67.     Attached to the September 1, 2009 Form 8-K was a "Representative Form of Stock Purchase Agreement."  Nothing in that Stock Purchase Agreement indicated that the purchase price paid to the dissenting shareholders would include IAG common stock, let alone that such stock would be both (1) unrestricted from being sold into the market or (2) ineligible to receive the $4.85 per share dividend.

68.     From September 1, 2009 through September 15, 2009, IAG, and later CNC, both through Morro their CEO, intentionally and fraudulently continued to omit these material facts and allowed IAG's stock to be purchased on the open market without restrictions or disclosure of the waived dividend.

69.     It was not until September 11, 2009, ten days after the agreements were reached, and one day after the Plaintiffs completed their final purchases of IAG stock, that CNC issued a press release disclosing that some of the shares with respect to which the dividend had been waived had been sold into the public market.  (Ex. 3.)

70.     By omitting to disclose that certain IAG shares that were ineligible for payment of the declared dividend and were capable of being sold into the market, on which omissions the

Plaintiffs reasonably and justifiably relied in purchasing their shares of IAG, the Defendants induced the Plaintiffs to purchase IAG shares without knowing that certain shares may not be entitled to a dividend payment.

71.     If the Plaintiffs had known that IAG, CNC, and Morro intentionally or recklessly failed and refused to restrict trading in the IAG stock with respect to which the Closing Dividend had been waived, or of the possibility that some of the IAG shares available for purchase on the public market were ineligible to receive the Closing Dividend, then they never would have purchased the shares.

72.     By preparing and filing intentionally false and misleading public documents, CNC (and previously, IAG) and Morro participated in a scheme to deceive the market, which operated as a fraud and deceit upon the Plaintiffs by failing to disclose that these documents were false and misleading.

73.     The Plaintiffs have incurred significant economic loss and damages in connection with their purchases of IAG's shares as a result of the Defendants' intentional and willful actions, including without limitation, damages in the amount of the dividends the Plaintiffs should have received on their IAG shares.

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their favor on Count I and award the following relief:

(a)     Injunctive relief as set forth in Count X;

(b)     Compensatory damages in an amount to be determined at trial;

(c)     Punitive damages in an amount to be determined at trial;

(d)     Attorneys fees and costs; and

(e)     Such other and further relief as the Court deems just and proper.

**COUNT II**
**CONTROL PERSON LIABILITY**
**Violation of Section 20(a) of the Securities Exchange Act**
**(against Defendant Morro)**

74.     The Plaintiffs restate and reallege Paragraphs 1 through 73 as though fully set forth herein.

75.     Morro was and acted as a controlling person of IAG and, after the merger, CNC, within the meaning of § 20(a) of the Exchange Act.

76.     As CEO, CFO and Chairman of the Board of Directors for IAG and, after the merger, as CEO of CNC, and by virtue of his intimate knowledge of and participation in the details of the merger transaction between IAG and Sing Kung, including without limitation, the negotiation of the stock repurchase agreements with respect to IAG's dissenting shareholders in relation to the merger transaction, Morro had the power and influence to control and did influence and control, directly or indirectly, the decision making of IAG and CNC, including without limitation, the content and dissemination of various statements that the Plaintiffs contend are false and misleading and the details of the stock repurchase agreements between IAG and its dissenting shareholders.

77.     Morro participated directly in, or was provided with or had unlimited access to all material information regarding the negotiations with IAG's dissenting shareholders with respect to the stock repurchase agreements.  Morro also was provided with or had unlimited access to copies of IAG's and CNC's reports, press releases, public filings, and other statements alleged by the Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause these statements to be corrected.  With respect to the public filings alleged by the Plaintiffs to be false and misleading, Morro signed each and every one of them.

16

78.     In addition, Morro had direct involvement in the day-to-day operations of IAG and CNC and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise the securities violations as alleged herein, and exercised the same.

79.     As set forth above, IAG, CNC and Morro, each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of his controlling positions, Morro is liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of his intentional and wilful misconduct, the Plaintiffs suffered damages in connection with their purchases of IAG's securities.

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their favor on Count II and award the following relief:

(a)     Injunctive relief as set forth in Count X;

(b)     Compensatory damages in the amount of the dividends that should have been paid to the Plaintiffs, plus interest;

(c)     Punitive damages in an amount to be determined at trial;

(d)     Attorneys fees and costs; and

(e)     Such other and further relief as the Court deems just and proper.

**COUNT III**
**FRAUD**
**(against all Defendants)**

80.     The Plaintiffs restate and reallege Paragraphs 1 through 73 as though fully set forth herein.

81.     As set forth above, IAG, Morro, and CNC, made false and misleading statements of material fact to the Plaintiffs regarding the stock repurchase by omitting material information relating to type of consideration that would be paid to the dissenting shareholders in exchange for their vote to approve the merger between IAG and Sing Kung and by omitting material

information regarding the fact that these non-dividend shares were not restricted from being sold into the public market. IAG, Morro, and CNC had a duty to disclose this material information in order to make the publicly filed statements at issue here not misleading, including without limitation, the August 10, 2009 Prospectus/Proxy (Ex. 2), the September 1, 2009 IAG Form 8-K (Ex. 7), and the September 9, 2009 IAG Form 8-K (Ex. 5).

82.    IAG, Morro, and CNC knew the statements and filings alleged by the Plaintiffs to be false and misleading were false when made.

83.    IAG, Morro, and CNC, made these statements and filings to induce the Plaintiffs and others in the investing public to act and to induce the dissenting shareholders to agree to the stock repurchase agreements and approve the merger between IAG and Sing Kung.

84.    The Plaintiffs reasonably and justifiably relied upon the false and misleading statements and filings in deciding to purchase shares of IAG.

85.    If the Plaintiffs had known that IAG, CNC, and Morro intentionally or recklessly failed and refused to restrict trading in the IAG stock with respect to which the Closing Dividend had been waived, or of the possibility that some of the IAG shares available for purchase on the public market were ineligible to receive the Closing Dividend, then they never would have purchased the shares.

86.    The Plaintiffs have incurred significant economic loss and damages as a result of the Defendants' intentional and willful actions, including without limitation, damages in the amount of the dividends the Plaintiffs should have received on their IAG shares.

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their favor on Count III and award the following relief:

(a)    Permanent injunctive relief as set forth in Count X;

(b)    Compensatory damages in an amount to be determined at trial;

(c)     Punitive damages in an amount to be determined at trial; and

(d)     Such other and further relief as the Court deems just and proper.

## COUNT IV
## FRAUDULENT INDUCEMENT
### (against all Defendants)

87.     The Plaintiffs restate and reallege Paragraphs 1 through 73 as though fully set forth herein.

88.     As set forth above, IAG and CNC, through Morro, made false and misleading statements of material fact to the Plaintiffs regarding the stock repurchase by omitting material information relating to type of consideration that would be paid to the dissenting shareholders in exchange for their vote to approve the merger between IAG and Sing Kung and by omitting material information regarding the fact that these non-dividend shares were not restricted from being sold into the public market.

89.     Among other reasons, both IAG, CNC, and Morro omitted these material facts from public filings with the SEC to induce the Plaintiffs and other potential shareholders to rely on them in deciding whether to purchase IAG shares and to induce the dissenting shareholders to accept the stock repurchase agreements, despite the fact that IAG, CNC, and Morro knew that at least some of IAG's shares were ineligible to receive a dividend as a result of the stock repurchase transactions.  The Defendants omitted these material facts to ensure that the merger between IAG and Sing Kung was approved, thus ensuring that they would obtain the significant financial benefit they would gain as a result of the merger occurring.

90.     IAG and Morro, and after the merger, CNC and Morro, knew at the time they made the false and misleading public disclosures that they were omitting to fully and accurately disclose the true nature of the stock repurchase transactions and the compensation that was to be paid to the dissenting shareholders, including the waiver of dividends.

19

91.     By omitting to disclose that certain IAG shares that were ineligible for payment of the declared dividend and were capable of being sold into the market, on which omissions the Plaintiffs reasonably and justifiably relied, the Defendants induced the Plaintiffs to purchase IAG shares without knowing that certain shares may not be entitled to a dividend payment.

92.     If the Plaintiffs had known that IAG, CNC, and Morro intentionally or recklessly failed and refused to restrict trading in the IAG stock with respect to which the Closing Dividend had been waived, or of the possibility that some of the IAG shares available for purchase on the public market were ineligible to receive the Closing Dividend, then they never would have purchased the shares.

93.     The Plaintiffs have incurred significant damages as a result of the Defendants' intentional and willful actions, including without limitation, damages in the amount of the dividends the Plaintiffs should have received on their IAG shares.

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their favor on Count IV and award the following relief:

(a)     Injunctive relief as set forth in Count X;

(b)     Compensatory damages in the amount of the dividends that should have been paid to the Plaintiffs, plus interest;

(c)     Punitive damages in an amount to be determined at trial; and

(d)     Such other and further relief as the Court deems just and proper.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(against all Defendant Morro)**

94.     The Plaintiffs restate and reallege Paragraphs 1 through 60 as though fully set forth herein.

95.     As an officer of, director of, and person who controlled IAG and later, CNC and

WHI, Morro owed a fiduciary duty to all of IAG's and CNC's shareholders, including the Plaintiffs, of honesty and good faith, due care, loyalty, and not to engage in self-dealing.

96.     Morro continues to owe these duties to CNC's shareholders, including the Plaintiffs.

97.     Morro was in control of IAG's actions, negotiations, and dealings with Sing Kung prior to the merger with Sing Kung and after that merger when the merged entity became known as CNC.

98.     Morro remained in control of CNC's actions after the merger, including with respect to all actions and decisions relating to the payment of dividends owed to shareholders.

99.     Morro, by his own admission, interacted with the Plaintiffs on numerous occasions regarding their questions about when their dividends would be paid.

100.    Morro, as CEO of both IAG and CNC, signed all relevant public filings by CNC after the merger that related to such dividends, CNC's financial condition, and the state of CNC's affairs.

101.    Indeed, Morro was responsible for negotiating and finalizing the stock repurchase transactions with the dissenting shareholders who waived their dividend rights.

102.    Morro had fiduciary duties to IAG's other shareholders not to allow that stock repurchase transaction to harm them.

103.    Morro also was responsible for disclosing all material facts to IAG's present and future shareholders with respect to that stock repurchase transaction.

104.    By failing to restrict and ensure that restrictions were in place to prohibit the dissenting shareholders from selling their non-dividend shares into the market, or at least causing IAG to issue a new class of stock to such shareholders on account of the waived dividend

attached to such shares such that public disclosure of the waived divided was effected, Morro breached his fiduciary duty to IAG's shareholders and allowed a fraud to be perpetrated on the market.

105. As detailed above, Morro himself obtained significant financial and other benefits from the merger with Sing Kung. As such he had every incentive to ensure that the dissenting shareholders were satisfied with the stock purchase agreement terms so that they would approve of, and not block, the merger.

106. At the time the Plaintiffs purchased their shares of IAG, they could not have known of the possibility that certain or all of their shares may not be eligible to receive any dividends.

107. Had the Plaintiffs known of such possibility, they never would have purchased their IAG shares.

108. Morro has failed and refused to take sufficient steps to determine whether the Plaintiffs' shares are eligible to receive the dividend. Instead, he has continued to represent, both directly to the Plaintiffs and through publicly filed Form 10-K reports, that such eligibility is being investigated and is yet to be determined.

109. Nevertheless, on May 30, 2012, in response to the Plaintiffs' demand for payment of the dividends, Morro unequivocally stated that CNC would not pay the dividend to which the Plaintiffs are entitled.

110. As such, Morro has breached his fiduciary duties to the Plaintiffs because he has caused CNC to refuse and fail to pay the dividends despite his failure to cause IAG to restrict the sale of the non-dividend stock into the market before the ex-dividend date and his failure to cause CNC to fully and fairly investigate whether the shares held by the Plaintiffs are, in fact, the

shares that are not eligible for the dividend payments.

111.    As a direct and proximate result of Morro's knowing and intentional breaches of his fiduciary duties, Morro has damaged the Plaintiffs by the amount of the dividends that should be paid to the Plaintiffs.

**WHEREFORE**, the Plaintiffs respectfully requests the Court to enter judgment in their favor on Count V and award the following relief:

(a)    Permanent injunctive relief as set forth in Count X;

(b)    Compensatory damages in the amount of the dividends that are being wrongfully withheld from the Plaintiffs, plus interest;

(c)    Punitive damages in an amount to be determined at trial; and

(d)    Such other and further relief as the Court deems just and proper.

## COUNT VI
## DECLARATORY RELIEF
### Pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201(a)
### (against all Defendants)

112.    The Plaintiffs restate and reallege Paragraphs 1 through 60 as though fully set forth herein.

113.    Given the circumstances alleged above, an actual and substantial controversy exists between the Plaintiffs and the Defendants regarding their legal rights.

114.    The Plaintiffs maintain that they are entitled to the payment of dividends on the shares they own and that given the conduct of the Defendants as set forth above, there is no basis upon which the Defendants can withhold payment of such dividends.

115.    The Defendants are failing and refusing to pay the dividends, maintaining that the Plaintiffs' shares are not eligible for the payment of such dividends.

116.    According the CNC's most recent Form 20-F annual report, there is an amount reserved and being held by CNC that is sufficient to pay the dividends in question.

117.    The Court should declare that the dividends requested by the Plaintiffs are due and payable, with interest, to the Plaintiffs to bring certainty and an end to the controversy.

118.    The adverse legal interests of the parties are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their favor on Count VI and award the following relief:

(a)    Declaring that the dividends on the IAG shares held by the Plaintiffs are due and payable to the Plaintiffs;

(b)    Mandatory injunctive relief as set forth in Count X ordering the payment of the dividends, with interest, to the Plaintiffs; and

(c)    Such other and further relief as the Court deems just and proper.

**COUNT VII**
**NEGLIGENT MISREPRESENATION**
**(in the alternative)**
**(against all Defendants)**

119.    The Plaintiffs restate and reallege Paragraphs 1 through 60 as though fully set forth herein.

120.    The Defendants, as a corporation with securities that are or were publicly traded, had a duty and obligation to provide accurate information to the public regarding their corporation through filings with the SEC and otherwise.  Indeed, providing information to the public was part of the regular course of business for IAG and later CNC, through Morro, as publicly traded companies.

121.    The Defendants issued a prospectus that was filed with the SEC stating that upon consummation of the merger with Sing Kung, the Closing Dividend would be paid to those IAG shareholders who have not exercised their conversion rights.  The Defendants also made other filings with the SEC regarding the stock repurchase transactions with the dissenting shareholders.

24

These filings negligently and carelessly failed to at any point prior to the purchases of IAG shares by Schnipper and Sunflower that, as part of the compensation paid to the dissenting shareholders, the dissenting shareholders would receive or be allowed to retain IAG shares, that the dissenting shareholders would waive the dividends on those shares, or that such shares were capable of being sold into the public market by the dissenting shareholders. By omitting these facts, the public filings were false and misleading.

122. As alleged above, Defendant Morro omitted material information in IAG's public filings prior to the Plaintiffs' purchase of IAG stock, caused IAG to omit such information, and Defendant CNC failed to timely and adequately disclose such information after the merger, which omissions negligently and carelessly misled the Plaintiffs into believing that the shares they purchased were entitled to the payment of the dividend IAG declared.

123. The Defendants, by virtue of making the aforementioned filings intended for the public, including Schnipper and Sunflower, to rely upon the statements therein in making decisions regarding whether to invest in IAG.

124. The Plaintiffs reasonably and justifiably relied to their detriment upon those filings in deciding to purchase their IAG shares.

125. If the Plaintiffs had known that IAG, CNC, and Morro negligently failed to restrict trading in the IAG stock with respect to which the Closing Dividend had been waived, or of the possibility that some of the IAG shares available for purchase on the public market were ineligible to receive the Closing Dividend, then they never would have purchased the shares.

126. The Defendants' negligent and careless misconduct has caused significant damages to the Plaintiffs in the form of loss of dividend payments to which the Plaintiffs would have been entitled but for the Defendants' omissions and misleading statements.

**WHEREFORE**, The Plaintiffs respectfully requests the Court to enter judgment in its

favor on Count VII and award the following relief:

> (a)    Injunctive relief as set forth in Count X;
>
> (b)    Compensatory damages in the amount of the dividends, with interest;
>
> (c)    Such other and further relief as the Court deems just and proper.

**COUNT VIII**
**PROMISSORY ESTOPPEL**
**(in the alternative)**
**(against all Defendants)**

127.    The Plaintiffs restate and reallege Paragraphs 1 through 60 as though fully set forth herein.

128.    As alleged above, Defendant Morro omitted material information in IAG's public filings prior to the Plaintiffs' purchase of IAG stock, caused IAG to omit such information, and Defendant CNC failed to timely and adequately disclose such information after the merger, which omissions intentionally and recklessly misled the Plaintiffs into believing that the shares they purchased were entitled to the payment of the dividend IAG declared.

129.    The Plaintiffs reasonably and justifiably relied to their detriment upon the Defendants' fraudulent omissions when they purchased their IAG shares.

130.    The Plaintiffs' reliance on the Defendants' omissions and misleading statements was detrimental because it induced them to purchase the IAG shares that the Defendants now claim are ineligible for the payment of a dividend.

131.    The Defendants' intentional and knowing misconduct has caused significant damages to the Plaintiffs in the form of loss of dividend payments to which the Plaintiffs would have been entitled but for the Defendants' omissions and misleading statements.

132.    The Defendants should be estopped from retaining these benefits for themselves by keeping the funds that are reflected on CNC's balance sheet as reserved for payment of

26

dividends rather than paying them to the Plaintiffs.

**WHEREFORE**, The Plaintiffs respectfully requests the Court to enter judgment in its favor on Count VIII and award the following relief:

      (a)      Injunctive relief as set forth in Count X;

      (b)      Compensatory damages in the amount of the dividends, with interest;

      (c)      Punitive damages in an amount to be determined at trial; and

      (d)      Such other and further relief as the Court deems just and proper.

**COUNT IX**
**UNJUST ENRICHMENT**
**(in the alternative)**
**(against all Defendants)**

133.    The Plaintiffs restate and reallege Paragraphs 1 through 60 as though fully set forth herein.

134.    Through the Defendants' misconduct as detailed above, they have wrongfully retained a benefit in the form of dividends that are due and payable to the Plaintiffs.

135.    The Defendants issued a prospectus stating that upon consummation of the merger with Sing Kung, the Closing Dividend would be paid to those IAG shareholders who have not exercised their conversion rights.

136.    The Plaintiffs purchased their shares prior to the ex-dividend date and did not exercise any conversion rights with respect to the IAG stock they held.

137.    The Plaintiffs rightfully should have obtained the Closing Dividend payable on their IAG shares but for the Defendants' misconduct in failing to disclose material facts to the Plaintiffs regarding the stock repurchase agreements with the dissenting shareholders, the Defendants' failure to restrict trading in such stock, and the Defendants' failure to fully and adequately investigate whether the Plaintiffs' shares in fact were ones with respect to which a

dividend had been waived.

138.    The Plaintiffs have been deprived of those dividends being wrongfully retained by CNC.

139.    CNC's retention of the aforementioned benefits, while at the same time depriving the Plaintiff of those benefits, violates fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their favor on Count IX and award the following relief:

> (a)    Injunctive relief as set forth in Count X;
>
> (b)    Compensatory damages in the amount of the dividends, with interest;
>
> (c)    Punitive damages in an amount to be determined at trial; and
>
> (d)    Such other and further relief as the Court deems just and proper.

**COUNT X**
**MANDATORY INJUNCTIVE RELIEF**
**(against all Defendants)**

140.    The Plaintiffs restate and reallege Paragraphs 1 through 60 as though fully set forth herein.

141.    The Plaintiffs have a clearly ascertainable and protectible right to receive the payment of dividends that were declared and payable with respect to the IAG shares they purchased.

142.    The Plaintiffs' remedy at law is inadequate, and the Plaintiffs will suffer irreparable harm if injunctive relief is not granted, because, among other things, it derives value from (i) the obtainment of these dividends plus interest thereon and (ii) the ability to stop CNC from wasting the dividends by using the money set aside for their payment for other purposes.

**WHEREFORE**, the Plaintiffs respectfully request the Court to enter judgment in their

favor on Count X and award the following relief:

      (a)     A mandatory injunction to:

          (i)     Direct the Defendants to pay the amounts due to the Plaintiffs with respect to their IAG shares;

          (ii)     Restrain and enjoin Defendants from, directly or indirectly, using the funds said aside for paying the aforementioned dividends for any other purpose; and

      (b)     Such other and further relief as the Court deems just and proper.

**JURY DEMAND**
**(all claims)**

The Plaintiffs demand trial by jury on all the claims for damages.


Dated:  September 14, 2012                Respectfully submitted,

                                      STEVEN SCHNIPPER AND
                                      SUNFLOWER ENTERPRISES, L.P.


                            By:  /s/     Michael P. Tomlinson
                                  One of their attorneys


Michael P. Tomlinson (6279930)
Tomlinson Law Office, P.C.
8501 W. Higgins Road, Suite 420
Chicago, IL  60631
Phone:  (312) 715-8770
Fax:  (866) 625-7089